## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JTH TAX, LLC d/b/a LIBERTY TAX SERVICE,** | : | **No. 3:24cv252** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **KARISMA PAGE; MR. BIG DREAMS INC.; RANDY PAGE; PAGECO, INC.; DIAMOND EAGLE AGENCY LLC; DIAMOND EAGLE TAXES, INC; DIAMOND EAGLE LLC; and MARJORIE PAGE,** | : | |
| **Defendants** | : | |

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

### <u>MEMORANDUM</u>

Before the court are two motions filed by Defendants Karisma Page, Marjorie Page, and Randy Page, a motion to vacate entries of default and a motion to transfer venue to the United States Bankruptcy Court for the Eastern District of New York. (Doc. 57). Having been fully briefed, these motions are ripe for disposition.

### Background

This dispute involves seven Liberty Tax Service franchises in the Stroudsburg, Pennsylvania area and in Brooklyn, New York. On February 9, 2024, Plaintiff JTH Tax, LLC d/b/a Liberty Tax Service ("Liberty") filed suit against the defendants relative to these franchises. (Doc. 1, Compl.). In short, Liberty

asserts that its franchisees and a family member defied the franchise

agreements and unlawfully rebranded Liberty Tax Services stores to similar-

looking, competing businesses called Diamond Eagle.  Per Liberty, the

defendants' conduct circumvented non-competition, non-solicitation, and post-

termination obligations in the franchise agreements.  (Id. ¶ 1).

Counts I and II of the complaint allege that Defendants Karisma Page,

Randy Page, Mr. Big Dreams, Inc., and Pageco, Inc. breached the franchise

agreements with Liberty.[1]  Liberty further asserts that all defendants are liable for

conversion (Count III), violation of the Defend Trade Secrets Act of 2016, 18

U.S.C. § 1836, et seq. (Count IV), and various intellectual property infringements,

including violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count V).  Liberty's

complaint contends that Defendants Randy Page, Pageco, Inc., and Defendant

Marjorie Page also engaged in tortious interference with the franchise

agreements in Counts VI and VII.  Additionally, in Count VIII, Liberty claims that

all defendants conspired to tortiously interfere with the franchise agreements.

On March 13, 2024, the Clerk of Court entered default against all

defendants for failure to answer, plead, or otherwise defend against the

complaint pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. (Docs.

---

[1] Liberty alleges that Randy Page created two Pageco, Inc. entities, a Pennsylvania
corporation and a New York corporation.  The two entities are referred to collectively in the
complaint as Pageco, Inc.

36–43).  Following notice that Defendants Diamond Eagle Agency, LLC, Diamond Eagle Taxes, Inc., Mr. Big Dreams, Inc., and Pageco, Inc. filed Chapter 11 bankruptcy cases in the United States Bankruptcy Court for the Eastern District of New York, (Docs. 46–49), the court stayed this matter on March 26, 2024. (Doc. 50).  Subsequently, Liberty moved to lift the stay against Diamond Eagle, LLC, Karisma Page, Marjorie Page, and Randy Page. (Doc. 51).

On June 6, 2024, Defendants Karisma Page, Marjorie Page, and Randy Page filed the instant motions to set aside the defaults and transfer venue. (Doc. 57).  On July 3, 2024, the court lifted the stay as to these defendants only, which brings this case to its present posture. (Doc. 60).

**Jurisdiction**

As Liberty brings suit pursuant to the Defend Trade Secrets Act and the Lanham Act, the court has federal question jurisdiction.  <u>See</u> 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  The court has supplemental jurisdiction over the Liberty's state law claims pursuant to 28 U.S.C. § 1367.

**Analysis**

As noted above, Defendants Karisma Page, Marjorie Page, and Randy Page ("Page Defendants") move to set aside the entries of default and seek the

3

transfer of this matter to the United States Bankruptcy Court for the Eastern District of New York.  The court will address these requests for relief in turn.

### 1. Page Defendants' Motion to Vacate Entries of Default

The first matter involves the Page Defendants' motion to set aside the entries of default.  Pursuant to Rule 55(c), the court may set aside an entry of default for good cause. FED. R. CIV. P. 55(c).   The decision to vacate the entry of default is a matter of the court's discretion. Doe v. Hesketh, 828 F.3d 159, 174 (3d Cir. 2016)(citation omitted); Tozer v. Charles A. Krause Mill. Co., 189 F.2d 242, 244 (3d Cir. 1951).

Courts must consider three factors when determining whether a request to set aside default is warranted: (1) whether the plaintiff will be prejudiced; (2) whether the defendant has a meritorious defense; and (3) whether the default was the result of the defendant's culpable conduct. United States v. $55,518.05 in U.S. Currency, 728 F.2d 192, 194–95 (3d Cir. 1984).  Any doubts should be resolved in favor of setting aside default and reaching a decision on the merits. Feliciano v. Reliant Tooling Co., 691 F.2d 653, 656 (3d Cir. 1982); see also Gross v. Stereo Component Sys., Inc., 700 F.2d 120, 122 (3d Cir. 1983) ("we reiterate that as a general matter this court does not favor defaults and that in a close case doubts should be resolved in favor of setting aside the default and reaching a decision on the merits.").  "Less substantial grounds may be adequate

4

for setting aside a default than would be required for opening a judgment."
Feliciano, 691 F.2d at 656.

### a. Prejudice

The court first considers prejudice to Liberty. Page Defendants argue that Liberty will suffer no prejudice by setting aside the defaults. In opposition, Liberty argues that its request for injunctive relief should favor heavily into the court's analysis, highlighting the merits of its claims and asserting that it continues to suffer irreparable harm. (Doc. 61 at 8–11, 14–16).

Liberty's arguments essentially boil down to the delay arising out from the defaults and the corporate defendants' bankruptcy proceedings in the other forum. Nonetheless, "[d]elay in realizing satisfaction on a claim rarely serves to establish the degree of prejudice" necessary to prevent a default being lifted. Feliciano, 691 F.2d at 656–57 (citing Tozer, 189 F.2d at 246).

As for Liberty's references to its unrealized request for a preliminary injunction, the court notes that preliminary injunctions are extraordinary remedies that should only be granted in limited circumstances. Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec., 108 F.4th 194, 200 (3d Cir. 2024) (citing Mallet & Co., Inc. v. Lacayo, 16 F.4th 364, 391 (3d Cir. 2021)). Furthermore, with its motion for a preliminary injunction, Liberty seeks mandatory injunctive relief rather than to preserve the *status quo*, that is,

5

Liberty requested an order directing the defendants to act affirmatively in manners that would have essentially closed their businesses. (See Doc. 8-1). And the irreparable harm allegedly sustained by Liberty appears to be predominantly financial harm. There is no threat that the delay will push Liberty into insolvency. Rather, when this case was filed, Liberty was involved in its own international bankruptcy proceedings. (Doc. 64). Liberty's Chapter 15 case in the United States closed as of October 25, 2024. (Doc. 64-5). Thus, any lingering issues raised by the postponed hearing on the motion for a preliminary injunction do little to impact the prejudice analysis. Liberty would be free to reraise the request as to the Page Defendants if the defaults are set aside.

For the purposes of vacating a default, prejudice accrues when "a loss of available evidence, increased potential for fraud or collusion, or substantial reliance upon the judgment" occurs. Feliciano, 691 F.2d at 657 (citation omitted). Liberty has offered none of these considerations. Rather, Liberty has led with its liability evidence against the defendants as alleged in its complaint, motion for a preliminary injunction, and brief opposing this motion. (Docs. 1, 1-2 to 1-37, 8-2, 61). Any risk of fraud or collusion by the defendants is tempered by the proceedings in bankruptcy court. This factor thus weighs in favor of setting aside the default.

6

### b. Meritorious Defenses

The next factor to consider is whether the Page Defendants have raised any meritorious defenses.  A meritorious defense is "presumptively established when the 'allegations of defendant's answer, if established on trial would constitute a complete defense to the action.' " Hritz v. Woma Corp., 732 F.2d 1178, 1181 (3d Cir. 1984) (quoting Tozer, 189 F.2d at 244); $55,518.05 in U.S. Currency, 728 F.2d 192 at 195.  The court need not decide any legal issues in review of the allegations, but only determine whether the proffered defenses are "not 'facially unmeritous.' " See Emcasco Ins. Co. v. Sambrick, 834 F.2d 71, 74 (3d Cir. 1987)(quoting Gross, 700 F.2d at 123).  But to fulfill this requirement, the defendants' answer and pleadings "must raise specific *facts* which would allow him to advance a complete defense." Mike Rosen & Assocs., P.C. v. Omega Builders, Ltd., 940 F. Supp. 115, 118 (E.D. Pa. 1996)(citing $55,518 in U.S. Currency, 728 F.2d at 196)(additional citation omitted).  The proffered allegations must go beyond general denials. Id.

Page Defendants attach a proposed answer with affirmative defenses asserting that their dealings with Liberty "were based on legitimate and reasonable courses of action as a result of [Liberty's] breach of the franchise agreements." (Doc. 63-3, Separate Defenses ¶ 3).  Page Defendants also raise defenses that Liberty's claims are barred by unclean hands and that the

damages sustained by Liberty, if any, were caused by its own intentional conduct. (Id. ¶¶ 5, 6). Additionally, Page Defendants propose state law counterclaims against Liberty for breaches of the franchise agreements, unjust enrichment, conversion, tortious interference, and for an accounting. (Doc. 63-3, Counterclaims).

Per Page Defendants, in April 2021, the Internal Revenue Service ("IRS") advised Randy Page that Pageco, Inc's Electronic Filing Identification Number ("EFIN") would be suspended based on a payroll filing error.[2] (Id. ¶ 19). Despite correcting the error, Liberty advised Randy Page in January 2022 that the IRS was not accepting tax returns submitted under Pageco, Inc.'s EFIN. (Id. ¶¶ 20–21). Consequently, Liberty told Randy Page that he had to turn over his franchise stores to Liberty until the IRS lifted the suspension. (Id. ¶ 22). But Liberty would not put that in writing. (Id. ¶ 23). Lacking trust in Liberty to return the stores, Randy Page rejected the offer. (Id. ¶ 23). Liberty then suggested that Randy Page could submit tax returns under Mr. Big Dreams, Inc.'s EFIN once Pageco, Inc. assigned that entity the franchise agreements. (Id. ¶ 24). Pageco,

---

[2] This discussion is derived from the allegations in support of the Page Defendants' proposed counterclaims. The court refers to these averments only to determine whether meritorious defenses are asserted and makes no determination as to the ultimate veracity of these allegations.

Inc. then assigned the franchise agreements to Mr. Big Dreams, Inc. and Karisma Page (Randy Page's wife) in February 2022. (See id. ¶ 24).

Liberty requires franchisees to submit tax returns to Liberty rather than directly to the IRS. (Id. ¶¶ 18). In December 2022, Page Defendants and all their tax preparers completed Liberty's Schedule C training programs and passed Liberty's exams regarding the reporting of business income or loss for their customers who are sole proprietors. (Id. ¶¶ 26–28 & n. 1). But, in January 2023, at the start of the tax season, Page Defendants' Schedule C submissions were rejected by Liberty. Despite Page Defendants' requests to Liberty for guidance, training, and support over the issue, Liberty merely told Page Defendants to refer to their training, which did not explain how to correct the rejected submissions. (Id. ¶¶ 30–33). Page Defendants assert that their Schedule C submissions were compliant, but Liberty's conduct caused them to lose an estimated $300,000 in revenue when potential customers had to be turned away. (Id. ¶¶ 33–35). Page Defendants then sought Liberty's help to cope with the financial losses in July 2023, but Liberty offered Page Defendants a high interest loan at 12% annual interest with a one-time 1% fee. (Id. ¶¶ 35, 36).

Also in July 2023, Randy Page met with three (3) representatives from Liberty. (Id. ¶ 37). At the meeting, the Liberty representatives accused the Page Defendants of preparing and submitting fraudulent Schedule A forms for itemized

9

deductions even though these returns were reviewed, approved by Liberty, and accepted by the IRS. (Id. ¶ 38). Liberty then "blacklisted" and locked Randy Page and Page Defendants' managers out of Liberty's systems without an opportunity for the defendants to explain, investigate, or cure the alleged Schedule A discrepancies. (Id. ¶¶ 39–40). Randy Page and the other individuals were also told to leave the franchise stores and not return. (Id. ¶ 41). Yet, two days later, per Page Defendants, one of Liberty's representatives told Randy Page to use Karisma Page's Preparer Tax Identification Number to submit tax returns. (Id. ¶ 43). Page Defendants assert such conduct by Liberty was illegal and intended to make it impossible to operate under the terms of the franchise agreements. (Id. ¶¶ 43–44). Consequently, Liberty's conduct caused Marjorie Page (Randy Page's sister) to apply for EFINs on behalf of the Diamond Eagle entities. (Id. ¶ 45).

Then, in September 2023, Liberty sent a Supplemental Review Services Agreement to Page Defendants, which would add $50.00 for each tax return reviewed by Liberty prior to filing. (Id. ¶ 46). Per Page Defendants, this additional fee meant that the defendants would have to pay Liberty an additional $175,000 per year on top of approximately $215,000 in royalties paid yearly by the franchisees. (Id. ¶ 48). On top of those fees, Liberty allegedly charged Page Defendants fees for a franchise territory that did not belong to them, which were

automatically withdrawn from the defendants' tax preparation fees. (Id. ¶¶ 49–
50).  In sum, Page Defendants' assert that Liberty's conduct intended to drive
them out of business. (Id. ¶ 51).

Thus, Page Defendants have stated some meritorious defenses against
Liberty with the above allegations acting as both a sword and a shield.  These
allegations also bolster any assertion of the doctrine of unclean hands in
response to Liberty's requests for injunctive relief.  The court does note,
however, that the proposed answer does not appear to advance any defenses to
the trade secrets and intellectual property claims.  Moreover, the Page
Defendants do not address the post-termination and non-competition covenants
in the franchise agreements or otherwise rebut allegations that they transformed
their Liberty Tax Service stores into tax preparation businesses branded with
another symbol associated with the United States of America.  But, based on
clear appellate directives that cases should be resolved on their merits, some
litigable defenses to some of the claims are better than no plausible defenses at
all.  See Hildebrand v. Allegheny Cnty., 923 F.3d 128, 132 (3d Cir.
2019)("Without a doubt, cases should be decided on the merits barring
substantial circumstances in support of the contrary outcome.").  This factor thus
weighs slightly in favor of vacating the default.

### c. Culpable Conduct

The last factor to consider is whether the default was the result of the Page Defendant's culpable conduct. Culpable conduct requires an examination of the "willfulness" or "bad faith" of a non-responding defendant. Hritz, 732 F.2d at 1183.

Page Defendants contend that that any delay in filing this motion was associated with obtaining separate counsel from the corporate defendants in bankruptcy. Randy Page represents that he retained two bankruptcy attorneys in December 2023 on behalf of Mr. Big Dreams, Inc. (Doc. 63-4, R. Page Decl. ¶ 3). Upon being served with this lawsuit, he then retained the same attorneys in February 2024 on behalf of Diamond Eagle Agency, LLC, Diamond Eagle, LLC, and Diamond Eagle Taxes, Inc.. (Id. ¶¶ 5-6). Per Randy Page, his bankruptcy counsel explained that they would file bankruptcy cases on behalf of the businesses. (Id. ¶ 6). But because the Page Defendants "are either *de facto* or *de jure* owners of the businesses," they believed that the bankruptcy attorneys would represent the individual defendants in this litigation, according to Randy Page's declaration. (Id. ¶ 7). As noted above, the bankruptcy cases were filed in the Eastern District of New York on March 22, 2024, about ten (10) days after defaults were entered. (Docs. 36–43 (Clerk's entries of default); Docs. 46–49 (suggestions of bankruptcy)). Randy Page indicates that he misinterpreted

12

statements made by the entities' bankruptcy attorneys as to the scope of their representation. (Doc. 63-4, R. Page Decl. ¶¶ 5-9). Upon receiving clarification, Randy Page attests that he immediately searched for an attorney to represent the individual defendants in this litigation, but the process took time. (Id. ¶¶ 10–11). In May 2024, bankruptcy counsel referred Randy Page to another attorney, but that individual needed to obtain permission to practice before this court. (See id. ¶ 12). Counsel for Page Defendants moved for special admission *pro hac vice* shortly thereafter, on June 4, 2024, and filed the instant motions two days later. (Docs. 55, 57).

The court cannot weigh the credibility of a declaration. Additionally, the circumstances suggest that there is more to this story. But even with some concern over the timeline proffered by Randy Page, the conduct of the Page Defendants in obtaining counsel to defend this action only reflects neglect, not willful misconduct, or bad faith. Thus, this factor also weighs in favor of opening the default.

Accordingly, the Page Defendants' motion will be granted, and the entries of default will be set aside pursuant to Rule 55(c). The Clerk of Court will also be directed to file the Page Defendants' proposed answer and counterclaims as the operative responsive pleading for these litigants. The other defendants remain in default.

13

## 2. Page Defendants' Motion to Transfer Venue

The Page Defendants also request that the court transfer this action to the United States Bankruptcy Court for the Eastern District of New York pursuant to 28 U.S.C. § 1412.  Based on the text of Section 1412, however, a district court may only transfer a case to another district court, in this case, the United States District Court for the Eastern District of New York.  See Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1212 (3d Cir. 1991)(citing 28 U.S.C. §§ 157(a), 1412).

Inherent in Page Defendants' argument to transfer venue is that this case has become "related to" the cases subsequently filed in the Bankruptcy Court for the Eastern District of New York. See 28 U.S.C. § 1334(b) ("the district courts shall have original, but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."); § 157(a) ("Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.").

"An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." Pacor Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984), overruled on

14

other grounds by, Things Remembered, Inc. v. Petrarca, 516 U.S. 124 (1995). In

its brief in opposition to the venue transfer request, Liberty does not challenge

Page Defendants' assessment that this case is related to the bankruptcy cases

for Defendants Diamond Eagle Agency, LLC, Diamond Eagle Taxes, Inc., Mr. Big

Dreams, Inc., and Pageco, Inc.

    "Where a civil proceeding already pending in one district court becomes

'related to' a [bankruptcy] case subsequently filed in another district court, the

proper method for transferring the related proceeding to the bankruptcy court

hearing the [bankruptcy] case is to seek a change of venue in the nonbankruptcy

forum pursuant to 28 U.S.C. § 1412[.]" Maritime Elec. Co., Inc., 959 F.2d at 1212.

    District courts in the Third Circuit thus apply Section 1412 to motions

seeking to transfer matters "related to" bankruptcy cases. Tang v. Citic Cap.

Holdings Ltd., No. CV 21-17008-JXN-AME, 2022 WL 6036573, at *5 (D.N.J. Oct.

7, 2022 (collecting cases); Tatum v. Chrysler Grp., LLC, No. CIV.A. 10-4269 ES,

2011 WL 6303290, at *1–*2 (D.N.J. Dec. 16, 2011) (collecting cases).

    Section 1412 allows for a district court to transfer a case "in the interest of

justice or for the convenience of the parties." 28 U.S.C. § 1412. "Courts have

construed this disjunctive language as it is written and found that an action may

be transferred if the transfer would be in the interest of justice *or* if it would be

more convenient to the parties." Waleski v. Montgomery, McCracken, Walker &

15

Rhoads, LLP, No. 3:18-CV-1144, 2018 WL 6977710, at *3 (M.D. Pa. Dec. 10, 2018), report and recommendation adopted, 2019 WL 123896 (M.D. Pa. Jan. 7, 2019) (citing Miller v. Chrysler Grp., LLC, No. 12-760, 2012 WL 6093836, at *5 (D.N.J. Dec. 7, 2012); Clark v. Chrysler Grp. LLC., No. 10-3030, 2010 WL 4486927, at *5 (E.D. Pa. Nov. 5, 2010)(emphasis in original)).

The Section 1412 analysis is broad and flexible and applied on a case-by-case basis with reference to multiple factors. See Tatum, 2011 WL 6303290, at *7; Abrams v. Gen. Nutrition Companies, Inc., No. CIV.A. 06-1820 (MLC), 2006 WL 2739642, at *9 (D.N.J. Sept. 25, 2006). Section 1412 largely includes the same criteria for transfer of venue as 28 U.S.C. § 1404(a), the general venue transfer statute, except that Section 1412 does not include a requirement that the transfer be made only to a district where the action might have been brought (or to a district to which all parties have consented). See In re Emerson Radio Corp., 52 F.3d 50, 55 (3d Cir. 1995)(predating an amendment to Section 1404(a) which added the consent provision).

Consequently, in analyzing whether the Page Defendants' request for relief should be granted pursuant to the bankruptcy venue transfer statute, the court will apply the Section 1404(a) factors set forth by the Third Circuit in Jumara v.

State Farm Ins. Co., 55 F.3d 873 (3d Cir. 1995).[3] See Tang, 2022 WL 6036573,
at *7; Waleski, 2018 WL 6977710, at *4; Al's Fam. Auto. v. Bennett, No. CIV.A.
11-6237, 2012 WL 246226, at *1 (E.D. Pa. Jan. 25, 2012); Abrams, 2006 WL
2739642, at *9.

Jumara directs courts to consider several public and private interests
relevant to the transfer analysis. See 55 F.3d at 879–80.  Where a party seeks to
transfer a "related to" bankruptcy matter, the moving party bears the burden of
proof that transfer is warranted, but the final decision on whether to transfer is
committed to the district court's discretion. See Abrams, 2006 WL 2739642, at *8
(citations omitted); see also Jumara, 55 F.3d at 879, 883 (citing Stewart Org.,
Inc. v. Ricoh Corp., 487 U.S. 22, 30–31 (1988)).

## a. Private Interest Factors

The court first considers the parties' arguments relative to the private
interest factors.  The private interest factors from Jumara include:

> (1)   plaintiff's forum preference as manifested in the
>       original choice;
>
> (2)   defendant's preferred forum;

---

[3] On occasion, judges in the United States District Court for the District of New Jersey have
applied a seven-factor test derived from the Second Circuit and from district court and
bankruptcy court decisions outside the appellate jurisdiction of the Third Circuit. Fire Ground
Techs., LLC v. Hometown Restoration, LLC, No. CV2119915JXNLDW, 2022 WL 1539065, at
*2 (D.N.J. May 16, 2022); Miller, 2012 WL 6093836, at *6 (citing Tatum, 2011 WL 6303290, at
*7); Perno v. Chrysler Grp., LLC, No. CIV.A. 10-5100 WJM, 2011 WL 868899, at *4 (D.N.J.
Mar. 10, 2011). The court will not follow this line of cases and will instead apply the factors
from Jumara and refer to cases considering these factors in the context of Section 1404(a).

(3)    whether the claim arose elsewhere;

(4)    the convenience of the parties as indicated by their relative physical and financial condition;

(5)    the convenience of the witnesses—but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and

(6)    the location of the books and records (similarly limited to the extent that files could not be produced in the alternative forum).

See 55 F.3d at 879 (citations omitted).

Additionally, the Third Circuit has shifted consideration of "all other practical problems that make trial of a case easy, expeditious and inexpensive" into the balancing of private interests. In re: Howmedica Osteonics Corp., 867 F.3d 390, 402 n. 7 (3d Cir. 2017)(citing Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex., 571 U.S. 49, 62, n. 6 (2013)).

### i.    Plaintiff's Choice of Forum

The first private interest factor considers plaintiff's choice of forum.  "It is black letter law that a plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request[.]" Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970)(citation omitted).  Moreover, in ruling on a motion to transfer venue, plaintiff's choice of venue "should not be lightly disturbed." Jumara, 55 F.3d at 879 (citation omitted).

18

In this matter, however, the franchise agreements contain forum-selection clauses, which Liberty ignores in its brief in opposition.[4]  Such clauses apply to lawsuits "that in any way relate[] to or arise[] out of" the franchise agreements or involve any "dealings" between franchisees and Liberty. (See e.g., Doc. 1-23, BrooklynNY-8 Franchise Agreement, ¶¶ 17b).  But those clauses memorialize the parties' consent to jurisdiction and venue "in the state and federal court of the city or county of Liberty's National Office (presently Virginia Beach, Virginia state courts and the United States District Court in Norfolk, Virginia)." Id.   By forum-selecting state court in Virginia Beach or the Eastern District of Virginia in the

---

[4] When a forum-selection clause exists, a district court must adjust the typical Section 1404(a) analysis in three ways: "district courts (1) must give no weight to the forum preferred by 'the party defying the forum-selection clause'; (2) must deem the private interests to 'weigh entirely in favor of the preselected forum' because the parties agreed to the preselected forum and thereby waived the right to challenge it as inconvenient; and (3) must proceed to analyze only public interests." In re: Howmedica Osteonics Corp., 867 F.3d at 402 (quoting Atl. Marine Constr. Co., 571 U.S. at 62–65).

Further complicating matters, Defendant Marjorie Page and the Diamond Eagle entities are not bound by the forum-selection clauses in the franchise agreements.  In that scenario, the Third Circuit provides a four-step inquiry for the court to consider in sequence as part of the Section 1404(a) analysis: (1) the forum-selection clauses, (2) the private and public interests relevant to non-contracting parties, (3) threshold issues related to severance, and (4) which transfer decision most promotes efficiency while minimizing prejudice to non-contracting parties' private interests. Id. at 403–04.

Neither side wishes to enforce the forum-selection clause in this case, however, and Page Defendants seek transfer of venue pursuant to an entirely different statute, 28 U.S.C. § 1412.  Additionally, if the forum-selection clauses were enforced, this action would still be in a different district court than where the bankruptcy cases are pending.  Absent additional guidance from the appellate courts, the court will apply some of the precepts of Atlantic Marine and Howmedica in its consideration of the Jumara factors as part of a Section 1412 analysis.

franchise agreements, Liberty already exercised its venue privilege before any dispute involving the parties arose. See Atl. Marine Constr. Co., 571 U.S. at 63. Only Liberty's initial choice of forum as set forth in the franchise agreements deserves any deference. Id. Consequently, Liberty's second choice, the Middle District of Pennsylvania, merits no weight. See id.

### ii.    Defendants' Preferred Forum

The next factor, the defendants' preferred forum, weighs in favor of transfer.  As articulated, Page Defendants "prefer to litigate this case in one forum instead of two, because litigating two cases arising from the same underlying facts creates the possibility of inconsistent rulings and increases... attorney's fees and costs."  (Doc. 63, Defs. Reply Br. at 8).

Liberty advances that the Page Defendants should be penalized for forum-shopping and for the delay between the time defendants were served and the filing of the instant motion to transfer venue. (Doc. 62, Pl. Br. in Opp. at 8).  Per Liberty, the Page Defendants' conduct suggests purposeful delay "so they could continue to unlawfully compete through the end of the tax season." (Id.)

Liberty's forum-shopping arguments miss the mark.  As discussed above, the franchise agreements contain forum selection clauses, which Liberty defied by pursuing this litigation.  Furthermore, this litigation involves five (5) franchise territories within the Middle District of Pennsylvania and two (2) franchise

20

territories in Brooklyn, New York within the Eastern District of New York. (See Doc. 1, Compl. ¶¶ 45–86). Per Liberty, Defendant Marjorie Page resides in Brooklyn and incorporated the Diamond Eagle Taxes, Inc. entity alleged to be engaged in active and continuing wrongdoing with the other defendants, including at former Liberty locations in Brooklyn.[5] (Id. ¶¶ 24, 26, 121–27, 137, 139–141, 144, 154–57, 164–66, 179–181, 190–91, 220, 228–231). Under the law, venue would be appropriate in the Eastern District of New York, where its Bankruptcy Court is addressing the corporate defendants' petitions. See 28 U.S.C. § 1391(b)(2)("A civil action may be brought in – a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated[.]").

As for arguments that the Page Defendants delayed the instant motion until after the end of tax season, Liberty's argument about timing cuts both ways considering the proposed answer and allegations supporting the Page Defendants' proposed counterclaims. For example, Liberty commenced suit

---

[5] Marjorie Page did not sign the franchise agreements or otherwise assent to the forum selection clauses. The court thus considers her private interests, not necessarily the private interests of Randy Page and Karisma Page. See In re: Howmedica Osteonics Corp., 867 F.3d at 403 ("[W]here the Atlantic Marine framework would wholly deprive non-contracting parties of their right to seek transfer on the basis of their private interests, the customary § 1404(a) analysis guarantees them that right.").

21

against the defendants in February 2024, seeking an injunction to essentially close the defendants' tax preparation businesses before the individual tax filing deadline. (See Doc. 8-1, Prop. Order). Per Page Defendants, however, Liberty breached the franchise agreements years before this litigation and engaged in ongoing efforts to wrest Liberty franchise stores away from Defendants Randy Page, Karisma Page, and their related entities. (Doc. 63-3, Prop. Counterclaim, ¶ 19–52). If the Page Defendants' version of the facts is ultimately credited, it is a story of small tax preparation businesses attempting to survive its affiliation with a large chain.

Page Defendants also contend that any delay in filing this motion was associated with obtaining separate counsel from the corporate defendants in bankruptcy.  Randy Page represents that he misinterpreted statements made by the entities' bankruptcy attorneys. (Doc. 63-4, R. Page Decl. ¶¶ 5-12).  His articulated reasons for the delay have been accepted by the court as not being willful or in bad faith.  Moreover, the suggestion that the defendants used the Bankruptcy Code to delay this litigation also rings hollow under Liberty's particular circumstances. (See Doc. 64, Pl. Status Report Re: Chapter 15 Bankruptcy Proceedings).  Thus, the court will give appropriate weight to the Page Defendants' preferred forum.

### iii.    Whether the Claim Arose Elsewhere

The third private interest factor addresses whether Liberty's claims arose elsewhere.  Liberty argues that this factor weighs against transfer and Page Defendants posit that this factor is neutral.

As noted above, Liberty's claims arose out of conduct by franchisees for franchise locations in or near Stroudsburg and in Brooklyn.  On the surface, the defendants operated more franchises in Pennsylvania and most of the defendants in this case are either Pennsylvania residents or Pennsylvania entities.  On the other hand, Brooklyn, New York has millions more potential tax customers than Monroe County, Pennsylvania.  Per Liberty, "[t]he gross receipts for defendants' franchise territories during the last fiscal year of their operation as Liberty offices totaled more than $1,500,000.00." (Doc. 62, Pl. Br. in Opp. at 9). Neither side breaks this number down into data from each franchise location. But the population near the Brooklyn franchise territories and the liquidated damages provisions in the franchise agreements suggest that the defendants' receipts skew higher relative to the Brooklyn locations and thus factor greatly into Liberty's potential damages claims. (See e.g. Doc. 1-23, BrooklynNY-8 Franchise Agreement, ¶ 10c).  The court, however, does not have enough information to delve into these details.  This factor is thus neutral.

23

### iv.    The Convenience Private Interest Factors

The fourth and fifth private interest factors weigh convenience to the parties and to the witnesses. Convenience to the parties evaluates the parties' relative physical and financial conditions, including who can afford travel to the transferee forum. Stewart v. First Student, Inc., 639 F. Supp. 3d 492, 500 (E.D. Pa. 2022)(quotation marks and citations omitted).

The Liberty entity involved in this litigation traces its ownership to BasePoint Group, Inc. and Drake Enterprises, Ltd. (Doc. 1, Compl. ¶ 17; Doc. 8. Corp. Disclosure Statement). The court has no specific information regarding these parent entities. From Liberty's recent filings with the court about exiting its own bankruptcy proceedings, however, all signs point to Liberty having financial resources and few liabilities, if any. [6] Liberty has the resources to litigate cases in any district in the United States (and in Canadian courts). On the other hand, the Page Defendants' related entities are small businesses involved in bankruptcy proceedings. Page Defendants' arguments about the impact of attorneys' fees and the costs of litigating in two forums thus carries some weight.

---

[6] Through bankruptcy proceedings under Canadian law, the equity interests of the Liberty entity involved in this case were acquired free and clear of all encumbrances and claims. (See Doc. 64, Pl. Status Report Re: Chapter 15 Bankruptcy Proceedings). Per counsel for Liberty, the Liberty entity in this lawsuit has been discharged from liability for conduct that occurred prior to January 2, 2024, including some or all of the matters raised in the Page Defendants' proposed answer and counterclaims. (Id.)

24

Turning next to convenience of witnesses, the court notes that "[t]here are many different types of witnesses...and each one carries a different weight." Coppola v. Ferrellgas, Inc., 250 F.R.D. 195, 199 (E.D. Pa. 2008).  Fact witnesses with firsthand knowledge of the events giving rise to the lawsuit traditionally have heavier weight than party witnesses or witnesses employed by a party.  Id. (citing Affymetrix, Inc. v. Synteni, Inc., 28 F.Supp. 2d 192, 203 (D. Del. 1998)). Moreover, the court is "only required to consider the convenience of witnesses 'to the extent that they may actually be unavailable for trial in one of the fora.' " Scanlan v. Am. Airlines Grp., Inc., 366 F. Supp. 3d 673, 678 (E.D. Pa. 2019)(citing Jumara, 55 F.3d at 879).

Liberty argues that many of its witnesses are in Pennsylvania.  Moreover, per Liberty, it "would be extremely inconvenient for these non-party witnesses to travel to New York," and "[s]ome of these witnesses may even refuse to travel to New York." (Doc. 62, Pl. Br. in Opp. at 9–10).  Yet, Liberty's arguments are not accompanied by affidavits from any potential witnesses.  Furthermore, the parties can probably construct various competing arguments about the convenience of Scranton, Pennsylvania versus the convenience of Brooklyn, New York for any witness based in the Stroudsburg area.  Unfortunately, neither side has given the court much to consider.  Thus, convenience considerations for the parties weigh

in favor of transfer and the convenience considerations regarding witnesses are neutral.

> ### v.    The Remaining Private Interest Factors

The next private interest factor considers the location of books and records, but limited to the extent that the files could not be produced in the alternative forum.  "[T]echnological advancements significantly reduce the weight of this factor as files can be easily reproduced and provided in electronic format." Scanlan, 366 F. Supp. 3d at 678 (citing Coppola, 250 F.R.D. at 200).  Here, the parties have not identified any documents that cannot be easily reproduced and provided in electronic format.  This factor is thus neutral.

The final private interest factor weighs practical considerations that could make the trial easy, expeditious, or inexpensive, but the court "must be careful to not interpret this factor so as to 'double count' any considerations [] made in the context of other factors." Id. at 679 (citing Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd., 2009 WL 3055300, at *5 (W.D. Pa. Sept. 21, 2009)).

Regarding this factor, Page Defendants argue that the ease and practicality of litigating in one venue weighs in favor of transfer.  Liberty contends that this factor weighs against transfer because the court is more familiar with this case. Per Liberty, practical considerations tip the scales to the Middle District of Pennsylvania because the court has had copies of all the pleadings, motions,

declarations, and voluminous exhibits since Liberty filed the action and because the court scheduled a preliminary injunction hearing.

Liberty's arguments might carry more weight if the injunction hearing occurred. Instead, this matter was stayed for several months due to the bankruptcy proceedings in the Eastern District of New York. It is still stayed regarding the corporate defendants. Thus, consideration of the bankruptcy proceedings outweighs any familiarity the court has with the issues in this case. Nonetheless, the analysis of this factor, which would weigh in favor of the Page Defendants, is based on issues considered with the other factors. As not to engage in any double counting, this factor is neutral.

Thus, to summarize the analysis of private interest factors, plaintiff's choice of forum is afforded no weight. Page Defendants' preferred forum weighs in favor of transfer due to the bankruptcy proceedings. The factor regarding convenience of the parties also weighs in favor of transfer. The remaining private interest factors are neutral.

**b. Public Interest Factors**

The court will next examine the public interest factors, which include:

      (1)    the enforceability of the judgment;

      (2)    administrative difficulties in the two fora due to court congestion;

      (3)    the local interest in deciding local controversies;

(4)    public policies of the fora;

(5)    the familiarity of the trial judge with the applicable
state law; and

(6)    consideration of judicial economy

See Jumara, 55 F.3d at 879–80 (citations omitted); In re: Howmedica Osteonics Corp., 867 F.3d at 402 & n. 7. [7]

## i.    Enforceability of the Judgment

The first public interest factor considers enforceability of the judgment.

Page Defendants' assert that this factor is neutral.  Liberty advocates that "[a]ny

judgment for injunctive relief will be easier to enforce if it is issued by this Court."

(Doc. 62, Pl. Br. in Opp. at 11).  But "the public interest in the enforceability of the

judgment is not concerned with the *convenience* with which the parties may

obtain a judgment; rather, this factor concerns whether a judgment is *capable* of

being enforced at all." In re Howmedica Osteonics Corp., 867 F.3d at 406, n. 10

(citation omitted)(emphasis in original).  Liberty does not argue that any district is

less capable of enforcing any judgment in this matter. This factor is thus neutral.

---

[7] As mentioned above, the Third Circuit shifted consideration of "all other practical problems that make trial of a case easy, expeditious and inexpensive" from the public interest factors to the private interest factors after the Supreme Court's decision in Atlantic Marine. See In re: Howmedica Osteonics, 867 F.3d at 402, n. 7 (citing Atl. Marine Constr. Co., 571 U.S. at 62, n. 6).

## ii.    Administrative Difficulties

As for court congestion considerations, Page Defendants argue that if this case is not transferred, the Middle District of Pennsylvania will have one more case than is necessary.  In opposing transfer, Liberty relies on statistical comparisons between the Eastern District of New York and the Middle District of Pennsylvania using caseload data from the Administrative Office of United States Courts ("AO").[8]  Liberty argues that, per the statistics, the Eastern District of New York is more congested.

Where AO statistics point to discernible differences in judicial caseload and time for disposition in the other venue, the court has weighed such considerations in a transfer analysis. Petroleum Serv. Co. v. Santie's Wholesale Oil Co., No. 3:23CV1500, 2024 WL 816619, at *7 (M.D. Pa. Feb. 27, 2024).  As of September 30, 2024, the Eastern District of New York had 13,741 pending criminal and civil cases pending for fifteen (15) judgeships with a median time for disposition of 5.8 months for civil cases.  In the Middle District of Pennsylvania, there were 3,498 pending criminal and civil cases for six (6) judgeships with a

---

[8] Liberty cites district court caseload statistics available as of December 31, 2023.  These statistics have been updated. See United States Courts — National Judicial Caseload Profile (September 30, 2024), https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2024.pdf (last accessed November 25, 2024).

median time of disposition of 8.7 months for civil cases.[9]  Judges in the Eastern
District of New York appear to have a higher overall caseload but close their civil
cases faster than judges in this district.[10]  This factor thus weighs slightly in favor
of transfer.

### iii.    The Local Interests and Public Policies of the Fora

Two public interest factors include consideration of local interests in
deciding local controversies and the public policies of the two locales.  Although
five of the seven franchises are in Pennsylvania, two of the franchises are in New
York.  This controversy is not local to one particular venue and any local interests
would be the same in both district courts.  Additionally, Liberty acknowledges that
Pennsylvania and New York public policies are the same relative to the issues in
this case. (Doc. 62, Pl. Br. in Opp. at 12).  These factors are thus also neutral.

---

[9] These statistics also measure "vacant judgeship months."  As of September 30, 2024, the
Middle District of Pennsylvania had 27.8 vacant judgeship months while the Eastern District of
New York experienced 1.2 vacant judgeship months.  Neither court has a judicial vacancy at
present. See United States Courts — Current Judicial Vacancies (Table),
https://www.uscourts.gov/judges-judgeships/judicial-vacancies/current-judicial-vacancies (last
accessed November 25, 2024).  But the Middle District of Pennsylvania has a future judicial
vacancy, while the Eastern District of New York does not. See United States Courts — Future
Judicial Vacancies (Table).https://www.uscourts.gov/judges-judgeships/judicial-
vacancies/future-judicial-vacancies (last accessed November 25, 2024).

[10] The AO statistics also do not include senior judges.  Including senior judges, the Eastern
District of New York has twenty-nine (29) total active Article III judges. See United States
Courts —United States District Court, Eastern District of New York
https://www.nyed.uscourts.gov (last accessed November 25, 2024).  The Middle District of
Pennsylvania has nine (9) total active Article III judges when three (3) senior judges are
included.  This is a possible explanation for the differences in civil case disposition times.

### iv.    The Familiarity of The Trial Judge with The Applicable State Law

The next public interest factor considers the familiarity of the trial judge with

the applicable state law.  Per Liberty, Virginia law applies to this case based on

the franchise agreements.  (Id. at 12; see also Doc. 1-23, BrooklynNY-8

Franchise Agreement, ¶¶ 17a).  Thus, there are no state law issues which would

support a Pennsylvania forum over a New York forum. See Abrams, 2006 WL

2739642, at *10 ("district courts often interpret and apply state law and this case

does not involve any novel or difficult applications of state law.").  This factor is

likewise neutral.

### v.    Judicial Economy Considerations

Finally, the court has been directed to acknowledge judicial economy as a

distinct, cognizable public interest. See In re: Howmedica Osteonics Corp., 867

F.3d at 402, n. 7.  "[C]ourts have consistently held that 'the district where the

bankruptcy case is pending is [generally] the proper venue for all proceedings

'related to' that bankruptcy case." Tang, 2022 WL 6036573, at *7 (citing 28

U.S.C. § 1409(a); Abrams, 2006 WL 2739642, at *9; Perno, 2011 WL 868899, at

*4)(explanatory parentheticals omitted).  To the extent that any general rule has

actually developed, that rule is rooted in judicial efficiency.

Here, judicial economy would clearly be served by centralizing the parties'

claims in the Eastern District of New York where the bankruptcy cases for

31

Defendants Diamond Eagle Agency, LLC, Diamond Eagle Taxes, Inc., Mr. Big

Dreams, Inc., and Pageco, Inc. are pending.  This factor favors transfer to the

Eastern District of New York.  Accordingly, all the non-neutral public interest

factors weigh in favor of transfer.

In sum, Section 1412 authorizes transfer "in the interest of justice **or** for the

convenience of the parties."  28 U.S.C. § 1412 (emphasis added).

Consequently, upon consideration of all the private and public interest factors,

the Page Defendants have met their burden in demonstrating that it is more

convenient **and** in the interest of justice to transfer this matter to the Eastern

District of New York.[11]  Page Defendants' motion to transfer venue will thus be

granted.

---

[11] The forum selection clauses and the private and public interests relevant to the non-contracting parties point to two different forums, the Eastern District of Virginia and the Eastern District of New York, respectively.  In similar matters involving the application of Section 1404(a), the court then considers severance, which would clearly be disallowed in this case based on indispensable parties. In re: Howmedica Osteonics Corp, 867 F.3d at 405.  At the fourth and final step of the Howmedica analysis, the court exercises its discretion in choosing the most appropriate course of action based on consideration of: "the nature of any interests weighing against enforcement of any forum-selection clause; the relative number of non-contracting parties to contracting parties; and the non-cont[r]acting parties' relative resources, keeping in mind any jurisdiction, venue, or joinder defects that the court must resolve." Id. After such consideration, detailed in this memorandum, the strong public interest in enforcing forum selection clauses is overwhelmingly outweighed by the bankruptcy proceedings in the Eastern District of New York involving the corporate defendants, the relatively important number of non-contracting parties (Marjorie Page and the Diamond Eagle entities), and those non-contracting parties' relative resources compared to Liberty.  Transfer to the Eastern District of New York is thus also optimal for the convenience of the parties and in the interest of justice where some, but not all the parties, have executed the franchise agreements with forum selection clauses. See id. 409–11.

**Conclusion**

For the reasons set forth above, Page Defendants' motion to set aside the entries of default and their motion to transfer venue will both be granted. The entries of default will be set aside as to the Page Defendants only and the Clerk of Court will be directed to docket their proposed answer and counterclaims. The Clerk of Court will also be directed to transfer this case to the Eastern District of New York. An appropriate order follows.

Date: 11/26/24

JUDGE JULIA K. MUNLEY
United States District Court

33